UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARIA RIVERA o/b/o,        :
ASHLEY RIVADENEIRA,        :
    Plaintiff,         :
                 :
     v.              :   CA 05-268 S
                 :
JO ANNE B. BARNHART,       :
Commissioner,              :
Social Security Administration, :
    Defendant.         :

## REPORT AND RECOMMENDATION

    This is an action for judicial review pursuant to 42 U.S.C. § 1383(c)(3) of the decision of the Commissioner of Social Security ("the Commissioner"), denying supplemental security income benefits ("SSI"), under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-1383(f). Plaintiff Maria Rivera ("Plaintiff"), on behalf of her daughter Ashley Rivadeneira ("Ashley" or "claimant"), has filed a motion for summary judgment or, in the alternative, for remand. Defendant Jo Anne B. Barnhart ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

    The motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I find that the Commissioner's decision that Ashley is not disabled is not supported by substantial evidence in the record. Accordingly, based on the following analysis, I recommend that Plaintiff's Motion for Summary Judgment or Alternative, for Remand (Document ("Doc.") #7) ("Motion to Remand") be granted and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #11) ("Motion to Affirm") be denied.

**Procedural History**

Plaintiff applied for SSI in June of 2002, (Record ("R.") at 11, 52-55),[1] claiming that Ashley was disabled because of a learning disorder, (R. at 57).  Following the September 25, 2002, denial of the application by the Social Security Administration ("SSA"), (R. at 28-30), Plaintiff on November 7, 2002, requested reconsideration, (R. at 32).  On August 16, 2003, the SSA again denied Plaintiff's application.  (R. at 33-35)  On August 21, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (R. at 36)  At a hearing held on September 16, 2004 (R. at 198), the ALJ heard testimony from Ashley, (R. at 203-24), and from Plaintiff, (R. at 224-30).  On February 1, 2005, the ALJ issued a written decision wherein he concluded that Ashley was not under a disability as defined in the Act, and, accordingly, was not eligible to receive SSI.  (R. at 20)  On March 10, 2005, Plaintiff filed a request for review with the Appeals Council.  (R. at 194)  The request was denied on April 18, 2005, thereby rendering the ALJ's decision the final decision of the Commissioner.  (R. at 4)

On June 16, 2005, Plaintiff filed a complaint in this Court, challenging the denial of benefits and requesting that the Court reverse the decision of the Commissioner and order that Plaintiff be awarded SSI or, in the alternative, remand the matter for application of the correct legal standard or for the taking of additional evidence.  See Complaint (Doc. #1) at 1, 3.

**Issue**

The issue for determination is whether there is substantial evidence in the record to support the decision of the

---

[1] The Administrative Law Judge ("ALJ") states that the application was filed on June 30, 2002.  (Record ("R.") at 11)  However, the application itself is dated June 10, 2002, (R. at 52), and was signed on June 15, 2002, (R. at 55).

Commissioner that Ashley did not have an impairment or combination of impairments resulting in marked and severe functional limitations and, therefore, was not disabled within the meaning of the Act.

### Background

The record at the time of the hearing before the ALJ included various school records, reports summarizing the results of educational testing, assessments by non-examining SSA experts, and medical records.  At the time of the hearing before the ALJ in September of 2004, Ashley was thirteen years old, (R. at 204), and in the eighth grade, (id.).  All of her classes were special education classes, (id.), and she had been receiving special education since the second grade, (R. at 158, 160, 165-66).  Ashley had been diagnosed in December of 2003 as suffering from post traumatic stress disorder, major depressive disorder with psychotic features (single episode, severe), and a learning disorder.  (R. at 167)  Following this diagnosis Ashley treated with The Providence Center for approximately nine months, (R. at 192), receiving medication and counseling, (R. at 164-93).  She was discharged from the treatment program at The Providence Center on September 2, 2004, because of multiple failures to keep appointments.  (R. at 193)

### Law Governing Childhood Disability Claims

Under the current standard for defining childhood disabilities under the Act:

> An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i); see also 20 C.F.R. § 416.906 (2006).

3

In evaluating a child's application for SSI benefits, an ALJ must engage in a three-part inquiry and determine whether: (1) the child is engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe; and (3) the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of the regulations. 20 C.F.R. §§ 416.924(b)-(d). If, at the third step of the analysis, the ALJ determines that the child's impairment does not meet or equal a listed impairment, the ALJ must then consider whether the child's impairment is equivalent in severity to that of a listed impairment (i.e., whether it "results in limitations that functionally equal the listings"). 20 C.F.R. § 416.926a(a).

Orben v. Barnhart, 208 F.Supp.2d 107, 109 (D.N.H. 2002).

Functional equivalency means that the impairment is of "listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain ...." 20 C.F.R. § 416.926a(a). A marked limitation is one that interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2)(i). The ALJ considers how a child functions in his activities "in terms of six domains:" "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." Id. § 416.926a(b)(1). The regulations provide that a child must be found to be disabled if he or she has an impairment or impairments of "listing-level severity," that is, an "extreme" limitation in one of these domains, or "marked" limitations in two or more domains. 20 C.F.R. § 416.926a(a).

Encarnacion v. Barnhart, 331 F.3d 78, 84-85 (2d Cir. 2003) (footnote omitted).

### ALJ's Decision

At the first step of the inquiry, the ALJ noted that Ashley had been born on January 2, 1991, and that she had never engaged in substantial gainful activity. (R. at 12) At the second step, the ALJ found that Ashley has a learning disability, depression,

4

and an oppositional defiant disorder, which were "severe" within the meaning of 20 C.F.R. § 416.924(c), because she had "more than slight abnormalities and more than minimal functional limitations." (R. at 12)  At the third step, the ALJ found that Ashley's impairments did not meet or equal in severity the requirements of any listed impairment. (R. at 15)  The ALJ then proceeded to a determination of whether Ashley's impairments functionally equaled a listed impairment.  He examined Ashley's performance in the six domains of functioning, (R. at 16-19), and found that she did not have an "extreme" limitation in any of them or a "marked" limitation in two of them, (R. at 19).  In fact, the ALJ concluded that she did not have a marked limitation in any domain of functioning.  (R. at 16-19)

The ALJ's assessment of Ashley's limitations in the six domains are show below:

Acquiring and Using Information:  moderate or less than "marked"
Attending and Completing Tasks:  slight or less than "marked"
Interacting and Relating with Others: moderate or less than "marked"
Moving About and Manipulating Objects:  no limitations
Caring for Yourself (Self-care):  no limitations
Health and Physical Well-Being:  no limitations

(R. at 16-19)

Plaintiff challenges the ALJ's findings that Ashley only has a moderate or less than "marked" impairment in the domains of acquiring and using information and interacting and relating with others. See Amended Memorandum of Law in Support of Plaintiff's Motion to Reverse and Remand the Decision of the Commissioner of the Social Security Administration ("Plaintiff's Mem.") at 14-18. The portions of the ALJ's decision addressing those two domains are reproduced below:

## Acquiring and Using Information

This domain considers how well the child acquires or learns information, and how well the child uses information learned.

In this domain, the child has a moderate or less than "marked" limitation.  While the claimant has a learning disability, which results in a slow learning process, formal IQ testing revealed a low average intellectual functioning and academic records reveal that while she functions below grade level, she is learning and using the information that she has learned.  The mother's reports of the claimant's limitations are far in excess of those observed by professionals or evidenced by testing including her statement that the claimant was not oriented to time or date yet examiners consistently observed the claimant was fully oriented except for the one occasion the mother stated the claimant was not oriented.  Dr. Callan noted the claimant had some academic difficulties and testing revealed a general cognitive ability within the low average range of intellectual functioning.  An IEP in 2002 revealed that while the claimant's academic skills were below grade level, she completed assignments, followed directions, and showed good effort.  An evaluation noted the claimant functioned two or three grade levels below actual grade level, however, a 2003 IEP indicated she was very excited about learning, had good oral comprehension skills, had good word attacks skills, used all four computation skills, solved two-step work problems, wrote using simple vocabulary and was demonstrating word diversity, could graph/chart, and was full of new ideas.  Further, the claimant informed her counselor that she liked to learn and Dr. Hall noted the claimant had improved her grades and was doing better.  A 2004 IEP indicated the claimant had a good work ethic, was motivated to do well in school, came to school prepared and ready to learn, was goal oriented, had increased reading fluency, had good math computations skills, and had excellent problem solving and mathematical reasoning skills and the claimant stated she had improved her grades.  The teacher completed a form noting an extreme impairment in cognitive/communicative development/function with functioning at the 4th to 5th grade level; however, an extreme impairment is in excess of the claimant's moderate academic deficiencies and indicates the teacher was not fully aware of the definition for that finding.

6

....

Interacting and Relating with Others

In this domain, the child has a moderate or less than
"marked" limitation.  The issue in this domain is how
well the child initiates and sustains emotional
connections with others, develops and uses the
community's language, cooperates with others, complies
with rules, responds to criticism, and respects and takes
care of the possessions of others.

While the claimant has some social limitations as a
result of impaired judgment and impulsivity, the record
does not support the mother's reports of severe
behavioral issues as treating sources described the
claimant as active, alert, playful, dependable, well
behaved, well liked, and engaging.  Dr. Callan noted the
claimant was an extremely well-behaved and pleasant child
with a good disposition and an IEP from 2002 revealed the
claimant was cooperative, followed directions, liked to
please, got along well with others, and participated in
group discussions.  Further, the mother completed a form
in June of 2002 stating the claimant's impairment did not
affect her behavior with other people in that she had
friends and generally got along with people.  A 2003 IEP
noted the claimant needed time out to control her
emotions on occasion but was well liked, responsible,
respectful, and very socially involved.  While Dr.
Farrell assessed a GAF of 45,[2] he observed the claimant
was pleasant and cooperative with no motor, speech or
thought content abnormalities and the GAF appears based
on the mother's reported symptoms rather than his
observations especially as an examination shortly

---

[2] "GAF" refers to the Global Assessment of Functioning Scale,
which considers psychological, social, and occupational functioning on
a hypothetical continuum of mental health disorders.  See Diagnostic &
Statistical Manual of Mental Disorders (4th ed.) ("DSM-IV") at 34.  A
GAF of 45 suggests:

   Serious symptoms (e.g., suicidal ideation, severe obsessional
   rituals, frequent shoplifting) OR any serious impairment in
   social, occupational, or school functioning (e.g., no friends,
   unable to keep a job).

Id. (bold omitted).

thereafter assessed a GAF of 55[3] and noted the claimant was helpful, engaging, and expressed her feelings well. Dr. Hall assessed a GAF of 40;[4] however, her notes reflect the claimant was engaged and talking about important issues including the effect of her mother's lifestyle on her.  While the claimant cited "visions," she stated her entire family saw them and the counselor observed that this was not a true psychosis but rather a "cultural experience" and the claimant later denied hallucinations.  It is noted the mother stated the claimant screamed and yelled almost daily, however, she indicated the claimant was not fighting and had no school suspensions and later stated the claimant was following "house rules."  Further, an IEP from 2004 noted the claimant was responsible, dependable, and well liked and the claimant stated she had no conflicts with peers. While the claimant's counselor completed a form indicating the claimant had a marked impairment in social functioning, this is inconsistent with the claimant's statements and observations by school officials and treating/examining sources.  The teacher indicated the claimant had a marked impairment in social development/function; however, the teacher appears to be unaware of the criteria necessary for this finding especially in light of her notation that the claimant was doing well in her group with positive interaction, was a good role model to others, and was nice and easy to talk to and observations by others that the claimant is

---

[3] A GAF of 55 is indicative of:

Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

DSM-IV at 34 (bold omitted).

[4] A GAF of 40 indicates:

Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.

Id. (bold omitted).

dependable, well liked, social, respectful, and well behaved.

(R. at 16-18)(bold omitted).

## Standard of Review

Pursuant to the statute governing review, the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Nevertheless, judicial review of the Commissioner's decision is limited in scope.

The court does not undertake a de novo review of the Commissioner's factual findings, nor does it re-weigh the evidence. See Schoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986). The decision "will be overturned only if it is not supported by substantial evidence,[5] or if it is based on legal error." Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995); see also Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). If the Commissioner's decision is supported by substantial evidence in the record, it must be upheld regardless of whether reasonable minds could differ as to the outcome. See 42 U.S.C. § 405(g); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769-70 (1st Cir. 1991).

---

[5] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938))(internal quotation marks omitted). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

## **Errors Claimed**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence.  See Plaintiff's Mem. at 13-14.[6] Specifically, Plaintiff alleges that the ALJ's findings that Ashley has only a moderate impairment in the domains of acquiring and using information and interacting and relating with others are not supported by substantial evidence.[7]  Id. at 14. Plaintiff also alleges that the ALJ discredited the testimony of Ashley and her mother without sufficient basis.  Id. at 18-20.

## **Discussion**

### I. **Acquiring and Using Information**

Plaintiff challenges the ALJ's conclusions that Ashley is "learning and using the information that she has learned," id. at 14 (quoting R. at 16), and especially that she has only "moderate academic deficiencies," id. (quoting R. at 17).  Regarding the latter conclusion, Plaintiff notes that in April of 2002 Ashley tested three levels below grade level in nearly all areas, id. (citing R. at 142), and that Individual Education Programs ("IEPs") for the sixth through eighth grade reflect serious deficiencies, especially with regard to reading and writing, id. (citing R. at 85-86, 88-90, 98-99, 101-03, 109-10, 113-15).[8]

---

[6] The pages of Plaintiff's memorandum are not numbered.  The Court has performed this task.  See DRI LR Cv 5(a)(3) ("Where a document is more than one page in length, the pages shall be numbered at the bottom center of each page.").

[7] Plaintiff does not challenge the ALJ's findings regarding the other four domains.  See Amended Memorandum of Law in Support of Plaintiff's Motion to Reverse and Remand the Decision of the Commissioner of the Social Security Administration ("Plaintiff's Mem.") at 13-20.

[8] Technically, Plaintiff did not include pages 85 and 109 in her citation of the record.  However, this appears to have been an inadvertent omission.  The pages are part of the Individualized Education Programs ("IEPs") which she cites, and they each reflect below grade level performance.  (R. at 85, 109)

While acknowledging that the record reflects some improvement, mostly in math, Plaintiff maintains that Ashley's functioning remained well below grade level even with accommodations. Plaintiff's Mem. at 14-15 (citing R. at 93-94, 106-07).

In addition to failing to appreciate the extent or significance of Ashley's below grade level performance, Plaintiff faults the ALJ for rejecting the assessment of Ashley's special education teacher, Dorie Ellison. Id. at 15. Plaintiff notes that Ms. Ellison had taught math to Ashley for two years before completing the assessment, id. (citing R. at 121), and that she assessed Ashley as having an "extreme" limitation in cognitive/communicative development and function, id. (citing R. at 121), despite the fact that math was Ashley's strongest subject, id. Moreover, Plaintiff asserts that the ALJ improperly assessed Ashley's performance in the protected special education setting with accommodations, id. (citing R. at 94, 107, 122), rather than in a regular grade level class, id.

In evaluating this claim of error, the Court bears in mind that a "marked" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean," 20 C.F.R. § 416.926a(e)(2)(i), and that:

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

20 C.F.R. § 416.926a(e)(2)(iii).

The Court finds it helpful in considering this claim of error to reproduce in table format the assessments which appear

in the record of Ashley's grade level performance in reading, writing, and math.   The assessments cover her performance in these areas from the fifth grade to the beginning of the eighth grade.

The information which appears in the table is taken from: an Evaluation Team Summary which was prepared on April 24, 2002, when Ashley was in the fifth grade, (R at. 141-42); IEPs which were prepared in May of each year, (R. at 85-95, 98-108, 109-20); and a Functional Assessment completed by Ms. Ellison in September of 2004 when Ashley was beginning the eighth grade, (R. at 121-23).   The page where the information can be found in the record appears in the column at the extreme right.   In order to have the entire table (and the footnotes which accompany it) appear on the same page, the remainder of this page is intentionally left blank.

| Date of Assessment | Grade | Reading Grade Level | Writing Grade Level | Math Grade Level | Record at |
|---|---|---|---|---|---|
| | | | | | |
| 4/24/02 | 5 | 2.1 | 2.0 | 3.1/2.3[9] | 141-42 |
| 5/21/02 | 5 | 2nd | 2nd | 3rd | 85, 88-90 |
| | | | | | |
| 5/13/03 | 6 | below grade*[10] | "mid 3rd" | 5th | 98, 102-03 |
| | | | | | |
| 5/10/04 | 7 | 4th | **[11] | ***[12] | 109, 110, 113 |
| | | | | | |
| 9/22/04 | 8 | mid 4th-5th | mid 4th-5th | 5th | 121, 123 |

As shown above, Ashley's performance in reading, writing, and math was for the most part three grade levels beneath her actual grade level. While her performance in math appears to have improved in the sixth grade (so that she was only one grade

---

[9] The April 24, 2002, Evaluation Team Summary states that "testing on the WS-R, has Ashley functioning on ... the 3.1 grade in Broad Math and the 2.3 grade level in Math Reasoning." (R. at 142)

[10] The May 13, 2003, IEP indicates that Ashley reads below grade level, (R. at 98), and with "some difficulty," (R. at 101). No grade level is stated for her reading ability. (R. at 98-108)

[11] The May 10, 2004, IEP does not state a specific grade level for Ashley's writing and math abilities, although it indicates that both are below grade level. (R. at 109-10) Regarding her writing skills, the IEP states that: "Ashley writes with great expression. She includes [illegible] in her writing. Her difficulty is with spelling, grammar and usage." (R. at 114)

[12] See n.7. Regarding her math capability, the May 10, 2004, IEP states: "Ashley is able to use the 4 basic computation skills. She can create tables and graphs. She has some knowledge and use of geometry, fractions, decimals and percents." (R. at 115)

13

level below where she should have been), this improvement does
not appear to have continued.  At the beginning of the eighth
grade, Ms. Ellison, Ashley's special education teacher, assessed
Ashley's math performance as being only at the fifth grade level.
(R. at 121)

Despite these evaluations reflecting, in general, a three
grade level deficiency in Ashley's reading, writing, and math
abilities, the ALJ described Ashley as having only "moderate
academic deficiencies ...."  (R. at 17)  He rejected Ms.
Ellison's assessment that Ashley had an "extreme" impairment in
cognitive/communicative development functions and functioned at
the fourth to fifth grade level.  (Id.)  His reason for doing so
was that "an extreme impairment is in excess of the claimant's
moderate academic deficiencies and indicates the teacher was not
fully aware of the definition for that finding."  (Id.)  However,
the definition of an extreme impairment appears on the Functional
Assessment form only two inches above the line where Ms. Ellison
indicated that Ashley had an extreme limitation, (R. at 121),
making it unlikely that she was unaware of the definition.
Moreover, her assessment of Ashley's performance appears to fit
within the definition of an extreme impairment which appears on
the form: "Three or more standard deviations below the norm is
considered an 'extreme' impairment."  (Id.)  Ms. Ellison's
written comments also appear to be consistent with an extreme
impairment assessment: "Ashley is functioning at a mid 4[th] – 5th
grade level in reading and writing.  She functions at a 5th grade
level in math."[13]  (Id.)  In addition, Ms. Ellison had known

---

[13] At the time Ms. Ellison wrote these comments Ashley was
beginning the eighth grade.

14

Ashley for two years,[14] (R. at 121), a fact which should have
added to the weight given to her assessment because it gave her a
longitudinal view of Ashley's abilities.  Cf. Richardson v.
Barnhart, 338 F.Supp.2d 749, 758 (S.D. Tex. 2004)("The teachers'
reports from 1999-2002[] offer the most longitudinal information
and opinions of C.R.'s academic accomplishments, behavior, and
ability to stay on task .... Accordingly, it was appropriate for
the ALJ to focus on these records ....").  Consequently, I find
that the reasons given by the ALJ to completely reject this
functional assessment by Ms. Ellison are not supported by
substantial evidence.

While the ALJ cited positive comments about Ashley's
attitude towards learning, her work ethic, her motivation, her
capabilities, including references to her "good word attacks
skills," (R. at 17), and "computation skills," (id.), the fact
remains that, notwithstanding these positive comments, after more
than three years of special education with accommodations[15]
Ashley was still functioning three grade levels below where she
should have been, cf. 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will

_____

[14] Plaintiff describes Ms. Ellison as Ashley's "long-time special
education teacher ...."  Plaintiff's Mem. at 15.  In the record, Ms.
Ellison identifies herself as Ashley's "classroom teacher (Sp. Ed.
Math), case manager for Special Ed.," (R. at 121), and indicates that
she has known Ashley for two years, (id.).

[15] The May 21, 2002, IEP indicates that of the 27.5 hours in
Ashley's school week 26 hours were in special education.  (R. at 93)
The same IEP reflects that she required accommodations in statewide or
district assessments of student achievement, specifically "[e]xtended
time, [and] frequent breaks."  (R. at 94)
      Similarly, the May 13, 2003, IEP states that of the 30 hours in
Ashley's school week 25 were in special education.  (R. at 106)  She
continued to require accommodations which were described at that time
as "alternate location, directions read/clarified, extended time,
frequent breaks, use of calculator."  (R. at 107)  It was noted that
"Ashley needs a small group modified curriculum in order to progress."
(R. at 106)  The same number of hours and identical comments were
repeated in the May 10, 2004, IEP.  (R. at 112, 119)

consider that good performance in a special education setting
does not mean that you are functioning at the same level of other
children your age who do not have impairments."). Such
performance cannot fairly be characterized as indicating only
"moderate academic deficiencies ...." (R. at 17)

Here the record indicates that Ashley's performance from the
fifth to the eighth grade in reading, writing, and math was, for
the most part, three grade levels below her actual grade level.
Cf. M.A.M. v. Barnhart, No. 05-6295, 2006 WL 2034743, at *1-2,
(E.D. Pa. July 18, 2006)(remanding matter to Commissioner for
purpose of determining whether fourth grader who achieved grade
equivalent scores of 1.7 in Word Reading, 2.2 in Numerical
Operations, and 1.1 in Math Reasoning on WIAT-II[16] was two,
three, or more standard deviations below the mean and whether
plaintiff's "daily functioning in the domain of acquiring and
using information is consistent with those scores").

The sole expert whose opinion supports the ALJ's finding
that Ashley is only moderately impaired in the domain of
acquiring and using information apparently reached that
conclusion based on the April 2002 standardized testing results.
(R. at 153) That expert did not have the benefit of Ashley's
school records for the sixth, seventh, and eighth grades which
show that Ashley's performance in reading, writing, and math
continued to be three years below her actual grade level. He
also did not have the September 22, 2004, Functional Assessment
completed by Ms. Ellison,(R. at 121), who had been Ashley's
teacher for two years, which assessed Ashley's cognitive/
communicative development function[17] as extremely impaired, (R.

---

[16] WIAT refers to the Wechsler Individual Achievement Test.

[17] The functional assessment of Ashley's cognitive/communicative
development/function required that Ms. Ellison consider the following
two questions:

at 121), and her social development function as well as her
concentration, persistence and pace as markedly impaired, (R. at
122).  Significantly, even without these later school records,
another Social Security reviewing physician concluded in
September of 2002 that Ashley had a marked impairment in
acquiring and using information.  (R. at 145)

     For the foregoing reasons, I find that the ALJ's conclusion
that Ashley had only a moderate impairment in the domain of
acquiring and using information is not supported by substantial
evidence.

## II.  Interacting and Relating with Others

     In reviewing the evidence regarding Plaintiff's claim that
the ALJ erred in finding that Ashley was not markedly impaired in
the domain of interacting and relating with others, the Court
again finds it helpful to summarize some of the relevant evidence
from school and treating sources in a table.

| Date | Doc. | Description of Ashley | R. |
|------|------|----------------------|-----|
| 4/4/02 | IR[18] | "[A]t this time she is extremely well-behaved and she had no history of serious disciplinary problems in the past .... Ashley is a pleasant child with a good disposition." | 135 |

---

     Are there any limitations in the child's ability to progress
     in applying the skills involved in reading, writing, and
     mathematics, child reasoning and problem-solving abilities,
     when compared to children of the same age?

     Are there any limitations in the child's ability to
     communicate pragmatically (i.e.[,] to meet his/her needs) and
     conversationally (i.e., to exchange information or ideas in
     the child's school classes, with peers or family), when
     compared to other children of the same age?  Please explain.

(R. at 121)


     [18] IR refers to the Interpretative Report by Martha Callan, school
psychologist, dated April 4, 2002.  (R. at 135)

| 5/21/02 | IEP | "Cooperative ... Follows Directions ... Likes to please ... Gets along well with others ... Participates in group discussion" | 85-86 |
|---|---|---|---|
| | | | |
| 5/13/03 | IEP | "Well liked, responsible, respectful ..., [but] needs time out to control emotions" | 99 |
| | | | |
| 11/18/03 | PE[19] | "patient has behavior problems at school, including fighting with other girls with history of two prior suspensions for fighting" | 166 |
| | | | |
| 5/10/04 | IEP | "responsible, dependable, well liked by peers, teachers, staff[;]" "very polite and respectful .... But ... often gets in trouble with her peers.  She really gets into talking/gossiping about her friends or telling others about her personal life.  Ashley would get upset when her friends talk about her.  She cannot control her temper and this leads to a fight." Short term objective is "learn how to interact with peers + staff positively and with good manners." | 109 110 116 |
| | | | |
| 7/7/04 | PN[20] | "Ashley seems to have developed better insight, however, her impulsivity [sic] interfer[e]s with her ability to think before she acts." "Ashley has done better; some school behaviors have stabilized and she is following mom's house rules." | 186 |
| | | | |

[19] PE refers to the Psychiatric Evaluation by Adrienne Hall, M.D., of The Providence Center, dated November 18, 2003.  (R. at 164-68)

[20] PN refers to a Progress Note by Michaella D. Costa ("Ms. Costa"), LICSW, of The Providence Center, dated July 7, 2004.  (R. at 186)

18

| 8/26/04 | FA[21] | (Marked impairment) "Client is easily angered and often her emotional/physical response is more extreme than that of the average person." | 190 |
|---------|--------|-----------|------|
|         |        |           |      |
| 9/2/04  | DS[22] | Behavioral Problems ("getting into frequent fights with other students.  At home ... 'always yelling.'") Unresolved | 192 |
|         |        |           |      |
| 9/22/04 | FA[23] | (Marked impairment) "Ashley is doing well in my group.  She interacts positively + [is a] good role model to others.  She is nice and easy to talk to." | 122 |

As reflected above, beginning in the spring of 2003 Ashley began to manifest difficulty in controlling her emotions.  (R. at 99)  Prior to that time, there is no evidence that she had any difficulty in her social relationships.  Indeed, as the ALJ noted, when Ashley's mother filed the application for benefits in June of 2002, (R. at 55), she indicated that "the claimant's impairment did not affect her behavior with other people in that she had friends and got along with other people," (R. at 17); see also (R. at 81).  From the spring of 2003 forward, however, there is significant evidence of an impairment in the domain of interacting and relating to others.  (R. at 99, 116, 161, 164, 166, 169, 174-75, 179, 181-83, 190)  While this evidence is not all uniform, it is sufficiently compelling that the Court is unable to find that the ALJ's determination on the issue is

---

[21] FA refers to a Functional Assessment completed by Ms. Costa on August 26, 2004.  (R. at 189-91)

[22] DS refers to a Discharge Summary completed by Ms. Costa on September 2, 2004.  (R. at 192-93)

[23] This section of a September 22, 2004, Functional Assessment was completed by Serei Tan, Ashley's school social worker.  (R. at 122)

supported by substantial evidence.  The Court reaches this
conclusion for the following reasons.

First, as to the only assessments in the record which
directly support the ALJ's conclusion, one predates the
appearance of Plaintiff's problematic behavior, (R. 145), and the
other was reached without benefit of the records reflecting such
behavior, (R. at 153).[24]  Thus, while both of the two Disability
Determination Services ("DDS") physicians concluded that Ashley
had no impairment in this domain, (R. at 145, 153), neither
expert was aware of Plaintiff's repeated school suspensions and
her "frequent fights with other students," (R. at 192).
Plaintiff testified that she had been suspended the previous year
"like three or four times for fighting," (R. at 205), and that
most of these suspensions had been for a week, (R. at 206),
although one was for a shorter period, (R. at 212).  In addition,
she had gotten into a fight at the pool in August of 2004, the
month immediately preceding the hearing before the ALJ.  (R. at
216)  The DDS physicians were also unaware that in the fall of
2003 Ashley had thoughts of suicide "most days for the past two
months," (R. at 164), that she had cut marks on her leg with a
kitchen knife, (id.),[25] and that she told her school counselor
Ms. Tan in May of 2004 that she "felt suicidal," (R. at 182).

---

[24] It is true that the record contains a treatment plan from The
Providence Center dated October 22, 2003, which states that Ashley has
a GAF of 55, (R. at 161), which would indicate only "[m]oderate
symptoms and moderate difficulty in life areas," Medical Proof of
Social Security Disability § 12:2.  However, this was an initial
assessment by Ms. Costa (not "Dr. Farrell," (R. at 17), as the ALJ
mistakenly believed) at the start of Ashley's treatment.  Ms. Costa
ultimately (after eight months of therapy) assessed Ashley as having a
"marked" impairment in social development/function.  (R. at 190)

[25] Although Ashley told Ms. Costa on January 20, 2004, that she
cut herself only once, (R. at 178), the record indicates that Ashley
attempted to cut herself on other occasions, (R. at 169), and that Ms.
Costa advised Ashley's mother to remove knives and sharp objects from
the home, (id.).

Second, the reasons given by the ALJ for rejecting the two assessments which indicate that Plaintiff is markedly impaired in this domain are not supported by substantial evidence.[26]   The ALJ rejected the opinion of Ashley's therapist, Ms. Costa, because it was allegedly "inconsistent with the claimant's statements and observations by school officials and treating/examining sources." (R. at 18)  However, Ashley testified about her multiple school suspensions and incidents of fighting.  (R. at 205-06, 211-12, 215-16)  She stated she was "always arguing with other people," (R. at 215), and that this resulted in fights, (id.).  Ashley described the relationship which she had with her younger sister as "really bad ...."  (R. at 219)  Thus, Ms. Costa's opinion was not inconsistent with Ashley's statements.  To the extent that the ALJ may have had in mind Ashley's testimony that she had not had any discipline problems "this year," (R. at 204), the hearing was held on September 16, 2004, less than three weeks into the start of the school year.  The fact that Ashley had not gotten into any fights or been suspended in that brief span of time does not undermine Ms. Costa's assessment that Ashley was markedly impaired in her social development function.

As for being at odds with "observations by school officials and treating/examining sources," (R. at 18), it is only the earliest observations, those made prior to May of 2003, that indicate no impairment in this domain, (R. at 85, 86, 135).

---

[26] Strictly speaking, the two Functional Assessments in the record do not require the evaluator to rate Plaintiff's impairment in the domain of interacting and relating with others.  However, they do ask the evaluator to rate essentially equivalent functions:

Are there any limitations in the child's ability to develop friendships[,] to relate to peer groups, and to reconcile conflicts between the child and peers or family members, when compared to other children of the same age?  Explain.

(R. at 122, 190)

Observations made after that time, while sometimes containing
positive remarks, (R. at 110, 122, 186), contain repeated
references to Ashley getting into fights, (R. at 116, 158, 166,
169, 182, 192), and having behavior problems, (R. at 116, 166,
169, 190, 192).[27]  These negative observations predominate to
such an extent that the Court is unable to uphold the ALJ's
rejection of Ms. Costa's opinion.

    While it is true that Ms. Costa commented in a July 7, 2004,
progress note that "Ashley has done better; some school behaviors
have stabilized ... she is following mom's house rules," (R. at
186), Ms. Costa's September 2, 2004, discharge summary indicates
that Ashley's behavioral problems were "Unresolved," (R. at 192).
Ms. Costa could have indicated on the form that Ashley's
behavioral problems were "Resolved" or "Partially Resolved,"
(id.), but opted instead for the more negative assessment.  This
indicates that the improvement which Ms. Costa noted in her July
7, 2004, progress note either had not continued or was not
considered substantial enough to warrant a positive assessment as
a "Final Outcome," (id.), of the therapy.  Coming at the end of
eight months of "regular[]," (id.), counseling sessions, the fact
that Ashley's significant behavioral problems were still
unresolved weighs heavily against the ALJ's conclusion that
Ashley was only moderately impaired in this area.  The fact that
Ashley had neither been in a fight for a month nor been suspended
during the first three weeks of the new school year does not
constitute substantial evidence that she was less than markedly
impaired in social functioning.

    The ALJ appears to have been under the impression that the

_____

    [27] The ALJ also appears to have construed a comment on the May 13,
2003, IEP that Plaintiff "was very socially involved," (R. at 99), as
a positive remark, (R. at 17).  However, the record indicates that the
writer considered this behavior to be problematic, (R. at 99), listing
it under the "NEEDS" (not the "STRENGTHS") column, (id.).

other assessment, which also found that Ashley was markedly impaired in this domain, was made by Ashley's teacher, Ms. Ellison. (R. at 18) It was actually made by her school counselor, Serei Tan, a school social worker, (R. at 122), with whom Ashley had weekly counseling sessions, (R. at 206).[28] Putting aside the ALJ's apparent confusion, the first reason given by the ALJ for rejecting this assessment is the same he gave for discounting Ms. Ellison's assessment that Plaintiff had an extreme impairment in the domain of acquiring and using information. The ALJ again expressed doubt that the author of the assessment was aware of the criteria necessary for this finding. (R. at 18) As previously noted, see Discussion section I supra at 14, the persuasiveness of this conclusion is substantially lessened by the fact that the terms "marked" and "extreme" impairment are defined on the first page of the Functional Assessment, (R. at 121). While it is true that the assessment made by Ms. Tan appears on the second page (whereas Ms. Ellison's appeared on the same page as the definition), this limited separation is not sufficient to allow the Court to conclude that the ALJ's first reason for rejecting Ms. Tan's opinion is supported by substantial evidence.

The ALJ also cited Ms. Tan's notation, which contained seemingly positive comments, as evidence that she was unaware of

---

[28] The significance of the ALJ's apparent misapprehension as to the author of the assessment stems from the fact that the ALJ discounted the assessment because "the teacher appears to be unaware of the criteria necessary for this finding ...." (R. at 18) This is essentially the same reason which the ALJ gave for discounting the assessment of Plaintiff's teacher (Ms. Ellison) that Plaintiff had an extreme impairment in the domain of acquiring and using information. (R. at 17) The Court has already concluded that as to Ms. Ellison this reason is implausible. See Discussion section I supra at 14. It is even more unlikely that both Ms. Ellison and Ms. Tan would fail to read the definitions of a "'marked' impairment" and an "'extreme' impairment," (R. at 121), when those definitions appeared on the first page of the Functional Assessment which they completed.

the criteria for a "marked" impairment.  (R. at 18)   However, the
comments are not necessarily contradictory of a "marked
impairment."  (Id.)   The notation begins with the statements that
"Ashley is doing well in my group.  She interacts positively +
[is a] good role model to others."  (R. at 122)   The reference to
"my group" suggests that Ms. Tan was comparing Ashley to other
children in her group (who presumably had behavior problems and
were required to participate in weekly group counseling) and not
to children who did not have behavior problems.  Cf. 20 C.F.R. §
416.924a(b)(3) (stating that in evaluating a child's impairment
the SSA compares the child's functioning to the functioning of
children who do not have impairments).  Thus, Ms. Tan's comments
are not necessarily inconsistent with her assessment that Ashley
was markedly impaired in her social functioning.

     The ALJ's final basis for rejecting Ms. Tan's assessment was
that it was at odds with the "observations by others that the
claimant is dependable, well liked, social, respectful, and well
behaved."  (R. at 18)   However, the Court has already determined
that the great majority of these observations predate the onset
of Ashley's behavioral problems.  By September 22, 2004, when the
Functional Assessment was completed, the seriousness of these
problems had reached a level that the earlier positive
observations cannot be said to constitute substantial evidence on
which to reject Ms. Tan's assessment.

     Third, the ALJ acknowledged that Ashley's mother reported
that Ashley screamed and yelled almost daily, (R. at 180), but
discounted the significance of this information because the
mother also "indicated the claimant was not fighting and had no
school suspensions and later stated the claimant was following
'house rules,'" (R. at 18).  However, the mother's negative
report regarding fights and/or suspensions was made during a
single session with Ms. Costa on February 10, 2004.  (R. at 180)

This lull apparently ended shortly thereafter as Ashley testified
that she got into a fight in February of 2004, (R. at 215-16),
and Ms. Costa recorded on February 24, 2004, that Ashley "has
some difficulties at home (screaming, overreacting) and school
(conflict [with] peers)," (R. at 181).  Ashley's mother also
reported on May 13, 2004, that Ashley was having increased
problems at school.  (R. at 182)  Similarly, the statement that
Plaintiff was following "mom's house rules," (R. at 186), was
written on July 7, 2004, but Ms. Costa subsequently noted in her
August 26, 2004, Functional Assessment that Plaintiff had
conflict with her mother, (R. at 190), in addition to being
markedly impaired in social development, (id.).

Fourth, Dr. Adrienne Hall, a child and adolescent
psychiatrist, performed a psychiatric evaluation of Plaintiff on
November 18, 2003, (R. at 164, 168), and diagnosed Plaintiff as
having a GAF at that time of 40,[29] (R. at 167).  The ALJ
acknowledged this assessment, but apparently discounted it
because allegedly Dr. Hall's "notes reflect the claimant was
engaged and talking about important issues including the effect
of her mother's lifestyle on her." (R. at 18)  However, the
notes the ALJ referenced were those of Ms. Costa.  (R. at 177)
While this misattribution by itself would not be significant, in
context of the entire record it contributes, albeit minimally, to
the Court's conclusion that the ALJ's finding in this domain is
not supported by substantial evidence.

In summary, the Court finds that the ALJ's determination
that Ashley has only a moderate impairment in the domain of
interacting and relating with others is not supported by
substantial evidence to the extent that this determination
applies to the period from September 16, 2004, the date of the

---

[29] See n.4.

25

hearing, through February 1, 2005, the date of the ALJ's
decision.[30]   The Court reaches this conclusion because: 1) the
record reflects a deterioration in Ashley's behavior after May of
2003, which was not considered by the DDS reviewing experts, and
2) the ALJ, in rejecting the assessments of Ashley's therapist
and counselor that she was markedly impaired in this domain,
relied upon positive comments and observations regarding Ashley's
behavior which either preceded the deterioration or which were
isolated and not representative of the record as a whole.

## III.   Assessment of Credibility of Ashley and her Mother

Plaintiff's final claim of error is that the ALJ discredited
the testimony of Ashley and her mother without sufficient basis.
See Plaintiff's Mem. at 18-20.   As to Ashley's mother,
Plaintiff's claim of error is rejected.   The reasons given by the
ALJ for discounting her testimony, (R. at 16), are supported by
substantial evidence.   The Court agrees that "[t]he mother's
reports of the claimant's limitations are far in excess of those
observed by professionals or evidenced by testing ...."   (Id.)
For example, the mother's insistence that Ashley does not know
how to read, (R. at 228-29), is contradicted by multiple entries
in the record describing Ashley's reading and writing ability
which, although below grade level, obviously exists, (R. at 113-
14, 121).

The ALJ's determination regarding Ashley's credibility is,
however, problematic.   The only reason given by the ALJ for
finding Ashley "partially credible," (R. at 19), is that her

---

[30] There is substantial evidence in the record which supports the
ALJ's determination that Ashley was not impaired in the domain of
interacting and relating with others when her application was filed in
June, 2002.   The Court's selection of September 16, 2004, as the date
as of which this determination by the ALJ cannot be sustained is based
on the totality of the evidence which existed in the record as of that
date, especially the assessments of Ms. Costa and Ms. Tan and Ashley's
own testimony.

"statements and presentation when seen without her mother reflect
far less impairments than when her mother is present ...," (R. at
19). As Plaintiff correctly notes, see Plaintiff's Mem. at 19,
Ashley testified in, and not outside of, her mother's presence at
the hearing, (R. at 202, 223-24). Thus, Ashley's testimony at
the hearing cannot be the basis for the ALJ's observation. The
Court has also carefully reviewed the record and is unable to
discern a difference between Ashley's statements to clinicians
when her mother was present and those made in her mother's
absence. To the extent that the ALJ may have had in mind
Ashley's presentation to clinicians such as Ms. Callan, (R. at
135), who in a one-on-one setting described Ashley as "a pleasant
child with a good disposition," (R. at 135), or to school
personnel, who prior to the onset of Ashley's behavior problems
described Ashley as "[c]ooperative," (R. at 85), and "[g]ets
along well with others," (R. at 86), the Court is unable to find
that these comments provide a valid basis for the ALJ's finding.
The observation by Ms. Callan was made in a one-on-one setting
and is not necessarily indicative of Ashley's behavior at home,
at school, or in the community. See 20 C.F.R. § 416.924a(b)(6)
("Children may function differently in unfamiliar or one-to-one
settings than they do in their usual settings at home, at school,
in childcare or in the community .... We will not draw
inferences about your functioning in other situations based only
on how you function in a one-to-one, new, or unusual
situation."). In addition, all of the observations cited by the
ALJ predate the onset of Ashley's behavior problems which first
appear in the records around May of 2003. In sum, the Court is
unable to find that the ALJ's reason for finding Ashley only
partially credible is supported by the record.

### Summary

For the reasons stated above, I find that the ALJ's findings

that Ashley has only a moderate or less than "marked" limitation
in the domains of acquiring and using information and interacting
and relating with others are not supported by substantial
evidence.  I further find that the reason the ALJ gave for
finding Plaintiff only partially credible is similarly not
supported by substantial evidence in the record.

## Conclusion

For the reasons stated above, I recommend that Plaintiff's
Motion to Remand be granted to the extent that this matter be
remanded to the Commissioner with instructions to have the entire
record reviewed by a DDS doctor or other qualified expert to
obtain an opinion as to the degree of Plaintiff's impairment in
the domains of acquiring and using information and interacting
and relating with others as of September 16, 2004.[31]  I recommend
that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be
specific and must be filed with the Clerk of Court within ten
(10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv
72(d).  Failure to file specific objections in a timely manner
constitutes waiver of the right to review by the district court
and of the right to appeal the district court's decision.  See
United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986);
Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st
Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
November 15, 2006

---

[31] See n.30.

28